**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | | |
|---|---|---|
| JULIA GADBOIS, | ) | 3:21-CV-1509 (SVN) |
| *Plaintiff*, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| CUMBERLAND FARMS, INC., | ) | |
| *Defendant*. | ) | September 18, 2024 |

**<u>ORDER ON MOTION FOR SUMMARY JUDGMENT</u>**

Sarala V. Nagala, United States District Judge.

      Plaintiff Julia Gadbois, a lesbian woman, alleges that her former employer, Defendant Cumberland Farms, Inc., discriminated against her on the basis of her sexual orientation primarily because Defendant passed her over for several opportunities to manage certain Cumberland Farms stores, eventually leading to her constructive discharge.  Defendant has moved for summary judgment, arguing there are no genuine disputes of material fact related to Plaintiff's claim of sexual orientation discrimination in violation of the Connecticut Fair Employment Practices Act ("CFEPA"), Conn. Gen. Stat. § 46a-51 *et seq.*, including her allegations of constructive discharge.

      For the reasons described below, the Court agrees and GRANTS Defendant's motion for summary judgment.

I.        **FACTUAL BACKGROUND**[1]

A.   Cumberland Farms Stores

Cumberland Farms is a regional chain of convenience stores that operates in Connecticut. Pl.'s L.R. 56(a)2 St. ¶ 1.  Cumberland Farms operates two types of stores:  (1) "Legacy" stores, which are older model stores that do not serve hot food items or have kitchens and typically have smaller staffs and lower customer volume; and (2) "AIM" stores, which are newer model stores that serve hot food items, have kitchens, and typically have larger staffs and higher customer volume.  *Id.* ¶ 2.  Cumberland Farms stores are managed by store managers, who are supervised by district managers; district managers, in turn, report to regional managers.  Def.'s Br., ECF No. 22-1 at 9.

Defendant states that employees who work at AIM stores and employees who work at Legacy stores share the same job titles, job coding, benefits, and compensation structures.  Pl.'s L.R. 56(a)2 St. ¶ 3.  Plaintiff contends that the positions at the two types of stores are not "equivalent," but does not specifically deny that they share the same titles, coding, benefits, and compensation structures.  *Id.*  Plaintiff disputes Defendant's contention that employees at AIM stores are not given preferential treatment over their counterparts in Legacy stores, contending that only managers of AIM stores have the opportunity to be promoted to district or regional manager and that managers of AIM stores have a higher chance of receiving a discretionary raise due to AIM stores' higher likelihood of more customer volume.  *Id.*  Plaintiff views a transfer from

---

[1] The factual background is taken primarily from Plaintiff's Local Rule 56(a)2 Statement, ECF No. 30 ("Pl.'s L.R. 56(a)2 St.").  The facts are undisputed, unless otherwise indicated.  The Court notes that Plaintiff's L.R. 56(a)2 St. has created unnecessary difficulties in interpretation.  First, it generally uses Roman, rather than Arabic, numerals. Second, and more significantly, by numbering the heading "Response to Rule 56(a)1 Statement of Facts" as Roman numeral I and beginning its substantive response to Defendant's first statement of fact as Roman numeral II, it has misaligned all of the subsequent numbered statements by one.  For ease of reference, the Court ignores Plaintiff's Roman numeral I and has used *Defendant*'s numbering convention, even though it cites to *Plaintiff*'s Local Rule 56(a)2 Statement because the latter contains Plaintiff's admissions and denials.

managing a Legacy store to managing an AIM store as a *promotion*; but to Defendant, transferring from a Legacy store to an AIM store is simply a *lateral* transition. *Id.* ¶ 5.

        B.  <u>Plaintiff's Employment at Cumberland Farms</u>

In 2007, Plaintiff began her career with Cumberland Farms as a cashier. *Id.* ¶ 9. Plaintiff has been married to Krystal Light, a woman who formerly managed the Cumberland Farms AIM store in Norwich, Connecticut, since 2017. *Id.* ¶ 8.

Plaintiff climbed the ranks over the years, eventually becoming manager of the AIM store in Madison, Connecticut in 2014. *Id.* ¶ 9. Between 2007 and 2017, Plaintiff resided in Brooklyn, Connecticut; her commute to Madison was approximately 64 miles, which took about an hour-and-a-half each way. *Id.* ¶ 11; Def.'s Br. at 11. In 2017, Plaintiff voluntarily transferred to manage the New London, Connecticut Legacy store, due to the long commute between her then-residence in Brooklyn and the Madison AIM store. Pl.'s L.R. 56(a)2 St. ¶ 12. Her salary did not change when she transferred.[2] *Id.* After her transfer to the New London Legacy store, Plaintiff moved from Brooklyn to Gales Ferry, Connecticut, where she still resides. *Id.* ¶ 14. Compared to Brooklyn, Gales Ferry is significantly closer to both the New London and Madison stores.

While she served as a store manager, Plaintiff's district manager was Joseph Mello until March of 2019, when Jeffrey Hampton briefly succeeded him. *Id.* ¶ 15. David Valente then replaced Hampton as district manager after Hampton was promoted to regional manager in July of 2019. *Id.* ¶ 18. Hampton and Valente understood that Plaintiff had transferred from the Madison store due to the length of her commute. *Id.* ¶ 16; Valente Dep., ECF No. 22-6 at 47. Both were also aware that Plaintiff hoped to return to managing an AIM store someday. Pl.'s L.R. 56(a)2 St.

---

[2] Plaintiff maintains that her salary did not change *despite* the transfer, claiming that she had a "specific agreement with her District Manager that her salary would not change even though she was being transferred to a Legacy store." Pl.'s L.R. 56(a)2 St. ¶ 12.

¶ 20; Hampton Dep., ECF No. 22-6 at 10.  Plaintiff aspired to be promoted to district manager and to one day become regional manager, and she believed that the only way she could achieve this was through an AIM store manager position.  Pl.'s L.R. 56(a)2 St. ¶ 21.

The parties dispute whether Hampton and Valente were aware that Plaintiff had moved from Brooklyn after she transferred to managing the New London Legacy store.  *See id.* ¶¶ 16, 19. Both Hampton and Valente testified that they did not know that Plaintiff lived in Brooklyn when she managed the Madison AIM store.  Hampton Dep., ECF No. 30-2 at 7; ECF No. 22-6 at 54– 55, 57–58.  Plaintiff erroneously claims Hampton admitted during his deposition that he knew Plaintiff moved from Brooklyn to Gales Ferry.  Pl.'s Opp. Br., ECF No. 29 at 16 (citing ECF No. 30-2 at 7).  In fact, Mr. Hampton unequivocally denied knowing where Plaintiff resided prior to her New London transfer.  *See* ECF No. 30-2 at 7, 9–10.  With respect to Valente's knowledge that Plaintiff resided in Brooklyn, Plaintiff testified that she told Valente that she lived in Brooklyn while she was in management training under Valente in Willimantic, Connecticut, sometime in approximately 2013.  Pl. Dep., ECF No. 30-1 at 5–6; Pl.'s L.R. 56(a)2 St. ¶ 9.

### C. Plaintiff's Allegations of Discrimination

Plaintiff claims that Hampton began discriminating against her in 2019, after she disclosed to him sometime in April 2019 that she was a lesbian and married to Light.  Pl.'s L.R. 56(a)2 St. ¶ 37.  She contends that Valente began discriminating against her when he became district manager, which was in July of 2019.  *Id.* ¶¶ 18, 38.  Plaintiff did not recall when Valente became aware of her relationship with Light, but Valente testified that he learned about it in 2018 and that he congratulated them upon hearing the news.  *Id.* ¶ 38.

Plaintiff alleges that the discriminatory behavior against her included not considering her for store manager openings at AIM stores, nitpicking her work, and giving her and her store artificially low ratings on various performance metrics. *See generally id.* ¶¶ 24–46.

### 1.  AIM Store Manager Openings

Defendant fills open store manager positions either by external hires or by internal promotions and transfers. *Id.* ¶ 23. External candidates and internal candidates who are not already store managers must first interview with Hampton and Valente, who decide whether to invite the applicants to enter a management training program that lasts between three to six months. *Id.* At the management training program, candidates learn how to manage both AIM and Legacy stores. *Id.* Those who successfully complete the program are then considered for open store manager positions as they become available. *Id.*

When a store manager position opens, Valente, as district manager, tries to move current managers closer to their homes if he is aware that is what the manager wants. *Id.* ¶ 22. He also considers managers who reach out to him expressing interest in a transfer, to determine if that manager would be a good fit for the role. *Id.* He will first discuss a potential transfer with a candidate to assess the candidate's interest in the opening. *Id.* In determining fit, Valente considers the store's customer volume and tries to avoid placing an inexperienced manager or a manager fresh out of the manager-in-training program at a high-volume store. *Id.* Ultimately, he has discretion to move managers to different stores based on the needs of his district. *Id.*

While Plaintiff was managing the New London Legacy store, eight AIM store manager positions opened in Valente's district. *See id.* ¶¶ 24–36. Although Plaintiff had told Valente and Hampton of her general desire to return to managing an AIM store, she did not discuss her interest in any of these positions with Hampton, Valente, or Human Resources when they opened.

*Id.* ¶¶ 24, 28, 31, 33–34.  Valente did not consider Plaintiff for these openings and ultimately hired heterosexual candidates for each, attesting that he believed Plaintiff would not have wanted to move to any of these stores because they would have involved a commute of approximately the same length as she had previously sought to be relieved from.  *Id.* ¶¶ 24, 29, 31, 35.  In summary, the openings and selected candidates were:

- **Deep River Store Opening.**  On July 5, 2020, Valente hired Lisa Marie Champagne-Bower, a heterosexual woman who was then store manager of the Legacy store in Baltic, Connecticut, for a manager opening at the AIM store in Deep River, Connecticut.  *Id.* ¶ 24; Def.'s Br. at 15.  Plaintiff asserts that she was more qualified than Champagne-Bower because Champagne-Bower had not managed an AIM store before and had told Plaintiff that she had trouble managing the Baltic Legacy store and did not feel ready to manage an AIM store.  Pl.'s L.R. 56(a)2 St. ¶ 24.

- **First Madison Store Opening.**  On November 8, 2020, Lisa Crampton, a heterosexual woman who was managing the Madison AIM store, was transferred to the AIM store in Branford, Connecticut.  *Id.* ¶ 26.  Valente hired Holly Toney, a heterosexual woman who had completed Defendant's management training program at an AIM store, for the opening in Madison.  *Id.*  Plaintiff believes she was more qualified by Toney primarily because Plaintiff had more years of management experience, including experience managing an AIM store.  *Id.*

- **Second Madison Store Opening.**  On February 1, 2021, Toney was transferred to a Legacy store following a colleague's retirement.  *Id.* ¶ 27.  Valente chose Heaven St. Vincent, a heterosexual woman who had recently completed the management training program and had previously worked in a non-management role at the AIM store in Groton, Connecticut, for the opening.  *Id.*  Plaintiff believes that St. Vincent was less qualified than her because St. Vincent had only recently completed the management training program.  *Id.*  On April 11, 2021, Ms. St. Vincent returned to her previous, non-management role at the Groton store.  *Id.*

- **Third Madison Store Opening.**  Crampton, who had previously managed Madison and was then managing the Branford AIM store, was temporarily assigned to cover both the Branford and Madison stores after St. Vincent's departure.  *Id.*  Crampton was then chosen to remain in the Madison management position.  *Id.*

- **Branford Store Openings (2).**  Once Crampton transferred fully back to Madison, Valente first temporarily hired manager-in-training Kyle Nelson, a heterosexual male, and then permanently hired Sarah Nelson, a heterosexual

female external candidate who had recently completed the management training program, to fill the vacancy in Branford. *Id.* ¶ 30. Plaintiff believes she was more qualified than Nelson because of her "ways of knowing the company." *Id.*

- **First Centerbrook Store Opening.** On October 25, 2020, Valente hired Holly Lincoln-Joly, then a manager of another AIM store, to manage the AIM store in Centerbrook, Connecticut. *Id.* ¶ 33. The record does not contain reference to Lincoln-Joly's sexuality. Plaintiff believes she was more qualified than Lincoln-Joly because Lincoln-Joly had allegedly told Plaintiff she could not manage her AIM store successfully and that Plaintiff was more qualified than Lincoln-Joly. *Id.*

- **Second Centerbrook Store Opening.** Upon Lincoln-Joly's resignation, Valente hired Dawn Adams, a heterosexual woman who had been managing the Baltic AIM store, on April 28, 2021. *Id.* ¶ 34. Plaintiff did not have any knowledge of Adams' previous experience and therefore could not opine on her qualifications vis-à-vis Plaintiff's qualifications. *Id.*

Plaintiff did not contact Human Resources to discuss her concerns about being passed over for these AIM store management positions. *Id.* ¶¶ 25, 28, 31, 34.

The parties agree that Plaintiff would not have received an increase in her base pay had she been transferred to any of these positions. *Id.* ¶¶ 24, 32, 36. Rather, Plaintiff asserts that managers receive discretionary raises based on store customer volume and AIM stores can have higher customer volume than Legacy stores. *Id.* ¶ 4. Although Plaintiff does not complete the chain of logic, the implication is that managers of AIM stores are more likely to receive discretionary raises than managers of Legacy stores. Plaintiff herself received a discretionary raise while working at the Madison store due to the store's high customer volume. *Id.* Defendant notes that it may provide discretionary raises to managers who work in high-volume stores, whether they manage Legacy or AIM stores. *Id.*

### 2. *Plaintiff's Guest Image Rating Scores and Performance Reviews*

As part of his duties as district manager, Valente traveled regularly to each store in his district to evaluate its "guest image rating" score, which ranged from 1 to 5 (5 being the highest). *Id.* ¶ 40. Regional managers also provide guest image rating scores when they visit a store in their

region.  *Id.*  A manager's history of guest image rating scores is reviewed, but is not a deciding factor, when deciding whether a store manager should be promoted to a district manager position. *Id.*

The stores in Valente's district are typically scored between a 3 and a 3.5.  *Id.*  Plaintiff claims that Valente said her store needed to be scored at a 4 or higher in order for her to be transferred to an AIM store.  *Id.* ¶ 41.  Defendant disputes that such a requirement exists.  *Id.*  And although Plaintiff asserts that Hampton and Valente consistently gave her store a rating of 4 prior to learning of her sexuality, there is nothing in the record before the Court documenting Plaintiff's guest image rating scores from before 2019.  Moreover, Plaintiff admits that neither Hampton nor Valente scored her stores as 4 or higher at any point during her tenure with Defendant.  *Id.* ¶ 42; *see also* Guest Image Rating Score History, ECF No. 22-5 at 29.  She further admits that Valente's scores "were consistent before and after he discovered that Plaintiff was homosexual,"[3] and that Hampton's scores were consistent during his tenures as both district and regional manager.  Pl.'s L.R. 56(a)2 St. ¶¶ 42–43.  Additionally, Hampton and Valente consistently awarded Plaintiff's wife's store a rating of 3.5, and sometimes even 4, both before and after Plaintiff alleges she informed them that she and Light were married.  ECF No. 22-5 at 29–31 (comparing the scores of Plaintiff's store, #4637, and Light's store, #4567, for the period between 2019 and 2022).

In addition to the guest image rating scores, Plaintiff received annual performance reviews. Plaintiff claims that her 2020 performance review, in which she received "Meets and Sometimes Exceeds Expectations" in all categories, was "negatively affected by Mr. Valente's . . . discriminatory conduct."  Pl.'s L.R. 56(a)2 St. ¶ 44.  Although Plaintiff agreed that Valente's

---

[3] Despite this admission, Plaintiff still claims in the same filing that after Valente told her that "she had to be rated at least a four on the Guest Image Rating Scale if she wanted to manage an AIM store, Valente would make a point to rate [her] store below a four.  [She] had consistently received scores of four and above prior to Valente telling her that she [sic] this is the score she would need to manage an AIM Store."  Pl.'s Supp. St., ECF No. 30 ¶ 11.

comments were "primarily positive," she alleges that his constructive feedback "negatively affected her review and was discriminatory." *Id.* ¶¶ 44–45.  Valente had said that Plaintiff needed to avoid "get[ting] caught up in drama or emotions" and that she should "[h]ave discussions through the chain of command first before jumping to conclusions."  2020 Performance Review, ECF No. 22-5 at 38.  Plaintiff highlights the second comment as an example of nitpicking.  Pl.'s L.R. 56(a)2 St. ¶ 45.  She believes that it stemmed from her involvement in an eight-week long special project during which she reported to a different supervisor than Valente or Hampton.  *Id.* Plaintiff had asked the project supervisor about her date of return to the New London store, and Valente apparently took issue with the fact that she did not approach Valente first.  *Id.*  Plaintiff believes that this comment was discriminatory based on her other interactions with Valente and because it did not make sense to bring up in the context of her performance review.  *Id.*

An earlier performance review in the record, effective April 1, 2018, was conducted by Hampton and Valente's predecessor, Mello.  *Id.* ¶ 46.  Although Mello's review was more critical and contained criticisms that Plaintiff believed to be inaccurate, Plaintiff does not believe that Mello's comments were discriminatory towards her.  *Id.*  Mello had given Plaintiff the same rating of "Meets and Sometimes Exceeds Expectations" and noted that her tendency to get sucked into workplace drama "leads to wonder if [she] can handle the larger team an AIM store requires." Performance Review, ECF No. 22-5 at 41–43.

### 3.  Nitpicking Incidents

Finally, Plaintiff lists a number of incidents in which Hampton and Valente—but mostly Hampton—allegedly nitpicked her work after they had learned that she was a lesbian.  All of the incidents occurred in 2019, two years before she eventually resigned.  Pl.'s L.R. 56(a)2 St. ¶ 39. For example, Hampton would correct Plaintiff's direct reports directly instead of bringing his

concerns to Plaintiff so that she could address them with her staff, although he did not do that with other store managers. *Id.* There were also several incidents during which Plaintiff believed Hampton undermined her in front of her direct reports, causing her staff to believe she was incompetent. *Id.* In addition, Hampton closely monitored the conditions of Plaintiff's work and store. *Id.* For example, upon learning that Plaintiff had to leave work early due to illness, Hampton immediately called Plaintiff to reprimand her for leaving work without first letting him know. *Id.* And on October 22, 2019, Valente told Plaintiff that her store was "finally looking good," but Hampton cut him off, saying it was still "not good enough" and gave her store a rating lower than what she believes that she and Valente would have given. *Id.* Finally, Plaintiff claims Hampton told her that if the store were closed due to lack of sales, Plaintiff would be demoted to "customer service leader," rather than keeping her in management because she was a qualified and experienced manager. *Id.* During these alleged nitpicking incidents, Plaintiff testified that one of her direct reports allegedly said: "[Y]ou can feel the homophobia coming off of Jeff [Hampton]." *Id.* (citing ECF No. 22-6 at 89–91).

### D. Plaintiff's Resignation

Plaintiff resigned from Defendant's employ on August 16, 2021. *Id.* ¶ 13. Plaintiff's resignation letter did not explain her reasons for resigning or mention any discriminatory actions or concerns over not being transferred to an AIM store. *Id.*; Def.'s Br. at 10–11. Plaintiff now contends that she felt compelled to resign "because she was passed over for promotions on multiple occasions due to the fact that she is a homosexual" and because there was "no opportunity for her to grow within the company considering the discrimination she was facing." Pl.'s L.R. 56(a)2 St. ¶ 13.

E.  Procedural History

On April 30, 2021, Plaintiff filed a charge of discrimination with the Connecticut Commission of Human Rights and Opportunities ("CHRO"), alleging sexual orientation discrimination and gender discrimination.  *Id.* ¶ 47.  Plaintiff did not amend her CHRO charge after she resigned in August of 2021.  The CHRO issued a release of jurisdiction in September of 2021, ECF No. 22-3 at 25, after which Plaintiff filed this instant suit in state court.  The complaint alleged sexual orientation discrimination in violation of the CFEPA (Count One); gender discrimination in violation of the CFEPA (Count Two); and gender discrimination in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* (Count Three).  Compl., ECF No. 1-1.  Defendant timely removed the action to federal court.

II.     **LEGAL STANDARD**

Federal Rule of Civil Procedure 56(a) provides, in relevant part, that a court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  A disputed fact is material only where the determination of the fact might affect the outcome of the lawsuit.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  With respect to genuineness, "summary judgment will not lie if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Id.*

In moving for summary judgment against a party who will bear the ultimate burden of proof at trial, the movant's burden of establishing there is no genuine issue of material fact in dispute will be satisfied if the movant can point to an absence of evidence to support an essential element of the non-moving party's claim.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986).  The movant bears an initial burden of "informing the district court of the basis for its motion, and

identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Id.* at 323.  A movant, however, "need not prove a negative when it moves for summary judgment on an issue that the [non-movant] must prove at trial.  It need only point to an absence of proof on [the non-movant's] part, and, at that point, [the non-movant] must 'designate specific facts showing that there is a genuine issue for trial.'" *Parker v. Sony Pictures Ent., Inc.*, 260 F.3d 100, 111 (2d Cir. 2001) (quoting *Celotex Corp.*, 477 U.S. at 324).  The non-moving party, in order to defeat summary judgment, must come forward with evidence that would be sufficient to support a jury verdict in his or her favor.  *Anderson*, 477 U.S. at 250.  If the non-movant fails "to make a sufficient showing on an essential element of [their] case with respect to which [they have] the burden of proof," then the movant will be entitled to judgment as a matter of law.  *Celotex Corp.*, 477 U.S. at 323.

In considering a motion for summary judgment, a court "must construe the facts in the light most favorable to the non-moving party and must resolve all ambiguities and draw all reasonable inferences against the movant." *Kee v. City of New York*, 12 F.4th 150, 158 (2d Cir. 2021) (internal quotation marks and citation omitted).  "Only when reasonable minds could not differ as to the import of the evidence is summary judgment proper." *Bryant v. Maffucci*, 923 F.2d 979, 982 (2d Cir. 1991) (citing *Anderson*, 477 U.S. at 250–51).

### III.        SEXUAL ORIENTATION DISCRIMINATION

Because Plaintiff has failed to demonstrate that she suffered an adverse employment action, and because her constructive discharge claim is time-barred and otherwise deficient, the Court

grants Defendant's motion for summary judgment as to Plaintiff's CFEPA sexual orientation discrimination claim.[4]

      A.  <u>Legal Standard</u>

CFEPA broadly prohibits discrimination by an employer based on an individual's "race, color, religious creed, age, sex, gender identity or expression, marital status, national origin, ancestry, present or past history of mental disability, intellectual disability, learning disability or physical disability." Conn. Gen. Stat. § 46a–60(b)(1). In 1991, the Connecticut legislature enacted Conn. Gen. Stat. § 46a–81c, which explicitly prohibits discrimination by an employer "in terms, conditions or privileges of employment because of the individual's sexual orientation."

Plaintiff's claim is analyzed under the familiar *McDonnell Douglas* burden-shifting framework. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973); *see Bd. of Educ. of Norwalk v. Comm'n on Human Rights & Opportunities*, 266 Conn. 492, 504–05, 505 n.18 (2003); *Heyward v. Jud. Dep't*, 178 Conn. App. 757, 767 (2017). Under the *McDonnell Douglas* burden-shifting framework, the plaintiff bears the initial burden of establishing a *prima facie* case of discrimination. *Tex. Dep't of Cmty. Affs. v. Burdine*, 450 U.S 248, 252–53 (1981); *Heyward*, 178 Conn. App. at 767. "A plaintiff's burden to establish an initial prima facie case is, by design, 'minimal and de minimis.'" *Kelleher v. Fred A. Cook, Inc.*, 939 F.3d 465, 468 (2d Cir. 2019) (cleaned up) (quoting *Woodman v. WWOR–TV, Inc.*, 411 F.3d 69, 76 (2d Cir. 2005)). To make a *prima facie* showing, Plaintiff must show: (1) she belonged to a protected class; (2) she was qualified for the position she held; (3) she suffered an adverse employment action; and (4) that the adverse employment action occurred under circumstances giving rise to an inference of

---

[4] Plaintiff has conceded that there are no genuine disputes of material fact with respect to her claims for gender discrimination under both the CFEPA and Title VII. *See* Pl.'s Opp. Br. at 19. Defendant is therefore entitled to summary judgment on these claims.

discriminatory intent. *Bart v. Golub Corp.*, 96 F.4th 566, 570 (2d Cir. 2024), *petition for cert. docketed*, No. 23-1346 (U.S. June 26, 2024); *Heyward*, 178 Conn. App. at 767; *see also Perez-Dickson v. City of Bridgeport*, 304 Conn 483, 514 (2012).[5]

B. Plaintiff's *Prima Facie* Case

Defendant does not dispute that Plaintiff belongs to a protected class and that Plaintiff was qualified for the position she held. Instead, Defendant argues: (1) that Plaintiff's claims of nitpicking, as a standalone adverse action, are untimely; (2) Plaintiff has not demonstrated she suffered an adverse employment action, including because a potential transfer to an AIM store is a lateral transfer that is not actionable; and (3) Plaintiff has not raised an inference of discriminatory intent. As to Defendant's first contention, Plaintiff's counsel clarified at oral argument that she is not pursuing her nitpicking allegations as a standalone type of adverse action, and therefore the Court does not discuss the untimeliness arguments further. Because the Court finds that Plaintiff has failed to demonstrate that she suffered an adverse employment action, the Court does not evaluate whether Plaintiff has raised an inference of discriminatory intent.

*1. Adverse Employment Action*

Under Connecticut law, "[a] plaintiff sustains an adverse employment action if he or she endures a materially adverse change in the terms and conditions of employment. . . . An adverse employment action has been defined as a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision

---

[5] As Plaintiff has not demonstrated that she suffered an adverse employment action, the Court ends its analysis with her *prima facie* case. The Court is, of course, aware, that if a plaintiff establishes a *prima facie* case, a presumption of discrimination is created and the burden of production shifts to the defendant to articulate some legitimate, nondiscriminatory reason for its adverse action. *Bart*, 96 F.4th at 570. If the employer makes such a showing, "the presumption of discrimination raised by the plaintiff's prima facie showing 'drops out of the picture,'" *Cronin v. Aetna Life Ins. Co.*, 46 F.3d 196, 203 (2d Cir. 1995) (quoting *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 511 (1993)), and "the burden then shifts back to the plaintiff to prove that the employer's stated reason was pretext for discrimination," *Bart*, 96 F.4th at 570 (citations omitted). It need not reach those other steps in this instance, however.

causing a significant change in benefits." *Desmond v. Yale-New Haven Hosp., Inc.*, 212 Conn. App. 274, 289 (2022) (cleaned up; quoting *Heyward*, 178 Conn. App. at 767–68). "Not every unwelcome employment action qualifies as an adverse action. Negative reviews, a change in job title, an increased distance to travel to work, or a lateral transfer do not, by themselves, qualify." *Smith v. Conn. Dep't of Corrs.*, No. CV-166034898-S, 2018 WL 2066116, at *2 (Conn. Super. Ct. Apr. 16, 2018) (quoting *Hill v. Am. Gen. Fin., Inc.*, 218 F.3d 639, 645 (7th Cir. 2000)).

The Court finds that Plaintiff has not carried even her *de minimis* burden of showing that she suffered an adverse employment action. Based on the record before the Court, none of Plaintiff's examples of discrimination—failures to transfer her to the AIM store manager openings, the nitpicking incidents, guest image rating scores, and her performance reviews—can be considered an adverse employment action under Connecticut law.

As an initial matter, Plaintiff has not shown that Defendant's failure to transfer her to an AIM store qualifies as an adverse employment action, as defined by Connecticut law. Defendant contends that transferring from a Legacy store to an AIM store is a lateral move, not a promotion. Def.'s Br. at 45. Indeed, Plaintiff appears to concede (by failing to respond directly) that employees who work at AIM stores and Legacy stores share the same job titles, job coding, benefits, and compensation structures. Pl.'s L.R. 56(a)2 St. ¶ 3. Plaintiff also concedes that she would not have received a change in her base pay had she been offered any of the eight AIM store manager openings she identifies. *Id.* ¶¶ 24, 32, 36.

Instead, Plaintiff argues that a transfer from a Legacy store to an AIM store is effectively a promotion for two reasons. First, she contends that Defendant gives discretionary raises to managers of higher-volume stores and AIM stores can have higher volume. Second, she believes that only AIM store managers have the opportunity to be promoted to district manager and regional

15

manager.  *Id.* ¶¶ 3–5.  Neither contention, however, supports her argument that transferring to an AIM store would result in a significant change in her benefits, such that Defendant's failure to transfer her qualifies as an adverse employment action under Connecticut law.

First, with respect to discretionary raises, Plaintiff concedes that managers of high-volume stores, whether they are Legacy or AIM stores, are eligible for discretionary raises.  *Id.* ¶ 4. Plaintiff was, therefore, eligible for a discretionary raise even while managing the New London Legacy store.  To demonstrate that she had a higher likelihood of receiving a discretionary raise if she were transferred to an AIM store, then, she would need to proffer some evidence that the AIM stores that had openings were, in fact, higher-volume than the Legacy New London store she managed.  But Plaintiff has put forward no evidence about the relative volumes of the New London Legacy store and the AIM stores with openings.  While Plaintiff contends that AIM stores *can* have higher volume than Legacy stores and notes that she received a discretionary pay raise when managing the AIM store in Madison in 2014, she has proffered no evidence that the AIM stores in Deep River, Madison, Branford, and Centerbrook actually had higher customer volume in 2020 and 2021, when the openings arose, than the New London Legacy store she managed.

Although Plaintiff's burden at this stage is *de minimis*, she still has the burden of producing at least *some* evidence to show that getting passed over for several AIM store management opportunities resulted in a "materially adverse change in the terms and conditions of [her] employment."  *Desmond*, 212 Conn. App. at 289.  Without any evidence of the relative volume of the other AIM stores compared to Plaintiff's New London store, the Court is hard-pressed to conclude that she had a higher likelihood of receiving a discretionary raise if transferred to one of the AIM stores with a management opening.  And without finding that likelihood, the Court cannot conclude that Plaintiff has shown a transfer to one of the AIM stores would have afforded her any

change in benefits, much less a significant change.  Therefore, the Court cannot find that she has suffered an adverse employment action based on the possibility of receiving a discretionary raise. *See Charles v. Conn., Jud. Branch, Ct. Support Servs. Div.*, 556 F. Supp. 2d 123, 128–30 (D. Conn. 2008) (holding Title VII plaintiff was unable to establish a *prima facie* case of discrimination because she failed to put forward any evidence showing that denial of transfer was an adverse employment action).

Plaintiff's subjective belief that only AIM store managers have the opportunity to be promoted to district manager and regional manager likewise does not suffice to demonstrate she suffered an adverse employment action.  Relying on Second Circuit precedent, the Connecticut Superior Court has held that "a plaintiff cannot rely on her own opinion of the difference in prestige levels to withstand a motion for summary judgment." *See Natale v. City of New Haven*, No. NNH-CV-186079090-S, 2019 WL 6245762, at *4 (Conn. Super. Ct. Oct. 29, 2019) (citing *Flynn v. N.Y. State Div. of Parole*, 620 F. Supp. 2d 463, 485–86 (S.D.N.Y. 2009) (in turn, citing *Dillon v. Morano*, 497 F.3d 247, 254–55 (2d Cir. 2007))).  And even assuming it were true that promotion was limited to AIM store managers, Plaintiff has not explained why or how she would have been precluded from these promotion opportunities when she had already met this alleged prerequisite: she previously managed the Madison AIM store.  *See Charles*, 556 F. Supp. 2d at 129–30 (where the plaintiff already had the type of experience the transfer opportunity offered, which she believed was a prerequisite to promotion, the failure to transfer her was not an adverse employment action).

Nor are Plaintiff's complaints of nitpicking, lower guest image rating scores, or her performance reviews adverse employment actions.  The instances of nitpicking by Hampton appear to be nothing more than everyday criticism provided by a supervisor to his or her

employee.[6]  *See Daniels v. Connecticut*, No. 3:12-cv-0093 (VAB), 2015 WL 4886455, at *7 (D. Conn. Aug. 17, 2015) ("As a general matter, excessive scrutiny and criticism on the job are not adverse employment actions. . . .  Scrutiny and criticism can qualify as adverse actions only when they lead to 'other negative results such as a decrease in pay or being placed on probation.'" (citations omitted)); *see also Traverso v. State Dep't of Educ.*, No. HHD-CV-095033170-S, 2016 WL 5003985, at *5 (Conn. Super. Ct. Aug. 11, 2016) (citing *Daniels*, 2015 WL 4886455, at *7).

To the extent Plaintiff claims that the nitpicking by Hampton led to her not being selected for the transfer opportunities, the argument does not hold water.  There is no evidence that Hampton, as regional manager, was involved in choosing who would fill AIM store manager openings in Valente's district.  And Plaintiff has admitted that Valente in fact complimented her store, *see* Pl.'s L.R. 56(a)2 St. ¶ 39 ("Mr. Valente told Plaintiff that her store was 'finally looking good.'"), and has highlighted only one instance of Valente nitpicking Plaintiff on a performance review that was otherwise complimentary of Plaintiff's workplace performance.  ECF No. 22-5 at 35–38 (noting Plaintiff's good work at rebuilding an outdated store, but allegedly admonishing Plaintiff to follow the chain of command).  Even assuming this was an instance of "nitpicking," the negative feedback does not rise to the level of an adverse employment action, when considered alone or in combination with Valente's decisions not to transfer Plaintiff to an AIM store.  *See Daniels*, 2015 WL 4886455, at *7.

Finally, Plaintiff's guest image rating scores and performance reviews, which she contends were negative, do not qualify as adverse employment actions.  Negative evaluations without any

---

[6] Plaintiff cannot rely on her testimony that a co-worker said that Hampton radiated homophobia.  As it is presented through Plaintiff's deposition testimony only, this is inadmissible hearsay, and Plaintiff has made no showing that the statement would be admissible at trial.  *See* Fed. R. Civ. P. 56(c)(2) (noting that a party may argue that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence); *Burlington Coat Factory Warehouse Corp. v. Esprit De Corp.*, 769 F.2d 919, 924 (2d Cir. 1985); *see also Nora Beverages, Inc. v. Perrier Grp. of Am.*, 269 F.3d 114, 123 (2d Cir. 2001) ("It is appropriate for a district court ruling on summary judgment to consider only admissible evidence.").

adverse results, such as "demotion, diminution of wages, or other tangible loss," are "not cognizable" under the anti-discrimination laws. *Smith v. City of New York*, 385 F. Supp. 3d 323, 334 (S.D.N.Y. 2019) (quoting *Siddiqi v. N.Y.C. Health & Hosp. Corp.*, 572 F. Supp. 2d 353, 367 (S.D.N.Y. 2008)).  Here, with respect to guest image scores, Plaintiff admits that her scores would not have foreclosed AIM store opportunities for her.  *See* Pl.'s L.R. 56(a)2 St. ¶ 41 (Plaintiff admitting that Defendant "does not require managers to obtain a 4 or higher on their guest image rating scores in order to manage an AIM store").  Nor has she put forward evidence of any other negative consequence of her guest image scores.  Accordingly, there is no support that these scores rise to the level of an adverse employment action.[7]

The Court reaches the same conclusion with respect to the performance reviews.  Plaintiff has not shown that the performance reviews, which she contends were negative, were coupled with any actual adverse results.  As with the nitpicking incidents and guest image rating scores, Plaintiff fails to specify how the performance reviews should be considered an adverse employment action besides stating generally that "[a]ll of these actions, led to a material change in the circumstances of the plaintiff's employment, which eventually led to her constructive discharge."  Pl.'s Opp. Br. at 7.  Her arguments are conclusory and unpersuasive.

---

[7] Further, there is no evidence in the record to support Plaintiff's claim that Valente and Hampton rated Plaintiff more harshly after learning of her sexual orientation.  Hampton's guest image rating scores from before he learned of Plaintiff's sexual orientation (in April of 2019) are similar to his ratings after.  *See* ECF No. 22-5 at 31 (showing Hampton's ratings for Plaintiff's store from March of 2019 to June of 2019, which indicate that Plaintiff received mostly 3-ratings both before and after April 2019).  Additionally, Hampton's ratings for Plaintiff's wife's store actually *increased* on some occasions after April of 2019, to 4.  *Id.* (showing Hampton's ratings for Light's store from the same time period).  As for Valente's guest image rating scores, he started rating Plaintiff in June of 2019, which is well after he learned of her sexual orientation at the year-end party in 2018.  *See* ECF No. 22-5 at 30 (Valente's guest image rating scores of Plaintiff's store).  Inexplicably, Plaintiff even *admits* that both Hampton and Valente's scores of Plaintiff's store were consistent before and after they learned about her sexual orientation.  *See* Pl.'s L.R. 56(a)2 ¶¶ 42–43; *see also id.* ¶ 42 (Plaintiff admitting that "[n]either Mr. Hampton nor Mr. Valente scored Plaintiff's store as a 4 or higher at any point during Plaintiff's tenure with Cumberland Farms").  There is simply no evidence in the record that Hampton or Valente rated Plaintiff higher before either of them learned of her sexual orientation.

For these reasons, the Court concludes that Plaintiff has not met her *de minimis* burden of demonstrating she was subjected to an adverse employment action, and thus has not established a *prima facie* case of discrimination.[8]

## IV.      CONSTRUCTIVE DISCHARGE

Under the umbrella of her sexual orientation discrimination claim, Plaintiff also asserts that she was constructively charged. *See* Compl. ¶ 57 ("Had it not been for the discrimination, the Plaintiff would have continued to work for Cumberland Farms."). To plead a *prima facie* claim of constructive charge, a plaintiff must allege that "(1) the employer intentionally created the complained of work atmosphere, (2) the work atmosphere was so difficult or unpleasant that a reasonable person in the employee's shoes would have felt compelled to resign, and (3) the plaintiff in fact resigned." *Karagozian v. USV Optical, Inc.*, 335 Conn. 426, 430 (2020).

But before filing suit, employees who believe that an employer has violated the CFEPA—including by constructive discharge—must, by statute, first pursue administrative remedies with the CHRO. *See Sullivan v. Bd. of Police Comm'rs of Waterbury*, 196 Conn. 208, 215–16 (1985) (explaining that "CFEPA not only defines important rights designed to rid the workplace of discrimination, but also vests first-order administrative oversight and enforcement of these rights in the CHRO"). Conn. Gen. Stat. § 46a-100 provides in relevant part that "[a]ny person who has

---

[8] The Court is aware that the United States Supreme Court has recently lowered the standard for determining the existence of adverse employment action under Title VII, holding that discrimination against a person with respect to the "terms and conditions" of her employment includes any "disadvantageous change" in such terms or conditions, regardless of whether any such harm is "significant." *Muldrow v. City of St. Louis*, 601 U.S. 346, 354–55 (2024) (quoting *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 80 (1998)). *Muldrow* was decided two months before the oral argument on the present motion. Neither party raised *Muldrow* at the oral argument, or in a notice of supplemental authority. While it is true that Connecticut courts routinely look to federal precedent for guidance in interpreting the CFEPA, "federal law defines 'the beginning and not the end of [their] approach to the subject.'" *See State v. Comm'n on Human Rights & Opportunities*, 211 Conn. 464, 470 (1989) (quoting *Evening Sentinel v. Nat'l Org. for Women*, 168 Conn. 26, 34–35 n.5 (1975)); *Hartford Police Dep't v. Comm'n on Human Rights & Opportunities*, 347 Conn. 241, 267 (2023) (noting that Connecticut state courts are not bound by federal precedent on Title VII). Because the parties have not raised the issue, the Court declines to speculate whether Connecticut state courts would interpret the CFEPA in the same way that the United States Supreme Court interpreted Title VII in *Muldrow*.

filed a complaint with the [CHRO] . . . and who has obtained a release of jurisdiction in accordance with section . . . 46a-101, may bring an action in the superior court."  Section 46a-101(a) in turn provides that "[n]o action may be brought in accordance with section 46a-100 unless the complainant has received a release from the [CHRO] in accordance with the provisions of this section."  The release of jurisdiction triggers administrative dismissal or disposal of the complaint, and the complainant has 90 days from the date of receipt of the release to file an action in court. *Id.* § 46a-101(d)–(e).  "The courts of this District have consistently applied the exhaustion provisions of the CFEPA to dismiss discrimination claims, finding a lack of subject matter jurisdiction where the plaintiff failed to obtain the requisite release prior to pursuing a private cause of action in court."  *Anderson v. Derby Bd. of Educ.*, 718 F. Supp. 2d 258, 272 (D. Conn. 2010) (citing cases); *see also Sullivan*, 196 Conn. at 217–18 (holding that a plaintiff's failure to exhaust administrative remedies "forecloses his access to judicial relief, because it deprived the trial court of jurisdiction to hear his complaint").

At issue here is whether Plaintiff exhausted administrative remedies with the CHRO.  To recap, Plaintiff filed her CHRO complaint on April 30, 2021, alleging sexual orientation discrimination and gender discrimination.  Pl.'s L.R. 56(a)2 St. ¶ 47.  Plaintiff resigned on August 16, 2021, but did not amend her CHRO charge after her resignation.  Plaintiff argues that she need not have amended her CHRO clause after her resignation primarily because Defendant was on notice that she was bringing a sexual orientation discrimination claim.  Pl.'s Opp. Br. at 18.

Connecticut courts analyzing CFEPA claims follow federal precedent on exceptions to the exhaustion requirements of CFEPA.  *See Ware v. State*, 118 Conn. App. 65, 81–84 (2009).  "It is clear that the court has jurisdiction to hear claims that are either:  (1) included in a CHRO complaint, or (2) based on conduct subsequent to a CHRO complaint that can be deemed

'reasonably related' to the CHRO filing." *Chouhan v. Univ. of Conn. Health Ctr.*, No. CV-096002439-S, 2013 WL 6335273, at *2 (Conn. Super. Ct. Nov. 5, 2013) (citing *Butts v. N.Y.C. Dep't of Hous. Pres. & Dev.*, 990 F.2d 1397, 1402 (2d Cir. 1993), *superseded by statute on other grounds*, Civil Rights Act of 1991, Pub. L. No. 102-66, 105 Stat. 1071 (1991); *see also Mallison v. Conn. Ofc. of Early Childhood*, 657 F. Supp. 3d 221, 231 (D. Conn. 2023) (applying the "reasonably related" exception to CFEPA claims brought in federal court). Courts will find that a claim is "reasonably related" to one asserted in the CHRO filing if: (1) the claim would fall within the scope of the CHRO investigation; (2) the claim alleges retaliation by the employer against the employee for filing the CHRO charge; or (3) "the plaintiff alleges further incidents of discrimination carried out in precisely the same manner alleged in the administrative charge." *Robitaille v. Town of Stratford*, No. FBT-CV-156053873, 2017 WL 1239198, at *5 (Conn. Super. Ct. Mar. 8, 2017) (citing *Zawacki v. Realogy Corp.*, 628 F. Supp. 2d 274, 283 (D. Conn. 2009); and then *Williams v. N.Y.C. Housing Auth.*, 458 F.3d 67, 70 & n.1 (2d Cir. 2006)).

Plaintiff's constructive discharge claim is not reasonably related to the claims in her CHRO complaint under any of these three theories. First, her constructive discharge claim would not necessarily have fallen within the scope of the CHRO investigation, which was initiated several months before she resigned. In assessing whether a claim falls within the scope of a CHRO investigation, "[t]he central question is whether the complaint filed . . . gave that agency adequate notice to investigate discrimination on both bases." *Ware*, 118 Conn. App. at 83. This means of establishing the "reasonably related" exception "is essentially an allowance of loose pleading and is based on the recognition that [CHRO] charges frequently are filled out by employees without the benefit of counsel." *Id.* As Defendant points out, however, Plaintiff was represented by counsel at the CHRO proceeding. *See* Def.'s Reply, ECF No. 31 at 11; *see also* ECF No. 22-3 at

19 (showing that Plaintiff was represented by counsel during her CHRO proceeding).  Moreover, the CHRO would not have been put on notice of Plaintiff's constructive discharge claim by her April 2021 complaint because she was still employed by Cumberland Farms when she filed the complaint.  *See* Pl.'s L.R. 56(a)2 St. ¶¶ 13, 47.  While Plaintiff conclusorily argues that the facts set forth in her CHRO complaint "suggest that [she] would eventually be forced to leave if the circumstances at work did not change," Pl.'s Opp. Br. at 18, the CHRO is not tasked with being prescient.  When it considered Plaintiff's original complaint, the CHRO could not necessarily have predicted that she would resign, much less that she would contend she would be *forced* to resign because of the allegedly discriminatory behavior.  In short, it was not put on notice of the possibility of a constructive discharge allegation, such that it could investigate that claim as an agency vested with "first-order administrative oversight and enforcement" of employment discrimination claims.  *Sullivan*, 196 Conn. at 216.

Second, Plaintiff does not allege retaliation for filing the CHRO charge.  *See* Compl. at 10–21.

Finally, Plaintiff does not seek to encompass allegations of further incidents of discrimination "carried out in precisely the same manner" that occurred after her CHRO complaint.  *See Robitaille*, 2017 WL 1239198, at *5.  Rather, she claims that a consequence of her original claims of discrimination was her constructive discharge.  But this is a materially different allegation than that previously presented to the CHRO, which it should have been given the opportunity to investigate prior to suit being filed.

In sum, Plaintiff has failed to exhaust her administrative remedies as to the constructive discharge claim.  Accordingly, the Court dismisses Plaintiff's constructive discharge claim as unexhausted.

Even if Plaintiff's constructive discharge claim were exhausted, however, it fails on the merits.  To plead a *prima facie* case of constructive discharge, Plaintiff must allege that "(1) the employer intentionally created the complained of work atmosphere, (2) the work atmosphere was so difficult or unpleasant that a reasonable person in the employee's shoes would have felt compelled to resign, and (3) the plaintiff in fact resigned." *Karagozian*, 335 Conn. at 430.  Plaintiff is only required to show that the employer intentionally created conditions in which a reasonable employee would feel compelled to resign, not that the employer intended to force the employee to quit.  *Id.* at 440.  In addition, Plaintiff's constructive discharge claim must "be supported by more than [her] subjective opinion that the job conditions have become so intolerable that . . . she was forced to resign." *Britell v. Dep't of Corr.*, 247 Conn. 148, 178 (1998) (citing *Seery v. Yale-New Haven Hosp.*, 17 Conn. App. 532, 540 (1989)).  "The standard contains a subjective inquiry (did the employer intend to create the working condition) and an objective inquiry (the impact the working conditions would have on a reasonable person)." *Karagozian*, 335 Conn. at 443.

Plaintiff has not proffered any evidence to show that Valente and Hampton nitpicked her work, failed to transfer her to an AIM store, or gave her store artificially low ratings with the intent of creating a work environment that would compel a reasonable employee to resign.  Further, Plaintiff has not provided any evidence that a reasonable person would find those alleged work conditions to be intolerable.  "In general, the denial of a promotion, criticism of an employee's work performance, or an employee's dissatisfaction with his job responsibilities and assignments do not suffice to establish a claim of constructive discharge." *Zephyr v. Ortho McNeil Pharm.*, 62 F. Supp. 2d 599, 608 (D. Conn. 1999) (collecting cases); *see also Karagozian*, 335 Conn. at 447 (citing *Zephyr*, 62 F. Supp. 2d at 608).  Plaintiff makes no attempt to distinguish the nitpicking, failure to transfer, or the artificially low ratings from the kind of conduct that generally fails to

meet the standard for constructive discharge.  *See* Pl.'s Opp. Br. at 19 (stating only that "[a]ny reasonable person who was criticized on a regular basis and passed over for a transfer to a more prestigious position with better opportunities on seven different occasions because of their sexual orientation would have felt compelled to resign").  Accordingly, even if Plaintiff's constructive discharge claim were exhausted, the claim would still fail on the merits.

## V.  CONCLUSION

For the reasons described herein, Defendant's motion for summary judgment is GRANTED in its entirety.  Plaintiff's sexual orientation discrimination claim is dismissed for failure to establish a *prima facie* claim of employment discrimination.  Plaintiff's constructive discharge allegations are likewise dismissed because she failed to exhaust administrative remedies and because they fail on the merits.

The Clerk is directed to enter judgment in favor of Defendant and close this case.

**SO ORDERED** at Hartford, Connecticut, this 18th day of September, 2024.

 /s/ Sarala V. Nagala
SARALA V. NAGALA
UNITED STATES DISTRICT JUDGE